TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

DANIEL E. LUNGREN
Attorney General

| | | |
|---|---|---|
| OPINION | : | |
| | : | No. 94-305 |
| of | : | |
| | : | July 20, 1994 |
| DANIEL E. LUNGREN | : | |
| Attorney General | : | |
| | : | |
| GREGORY L. GONOT | : | |
| Deputy Attorney General | : | |
| | : | |

THE HONORABLE MIKE THOMPSON, MEMBER OF THE CALIFORNIA STATE SENATE, has requested an opinion on the following question:

May a city restrict the number and hours of emergency medical landings and take-offs at a hospital heliport when issuing a conditional use permit for operation of the heliport?

CONCLUSION

A city may not restrict the number and hours of emergency medical landings and take-offs at a hospital heliport when issuing a conditional use permit for operation of the heliport.

ANALYSIS

We are informed that a city has issued a conditional use permit to a hospital for operation of a heliport. Two of the conditions attached to the permit are that no landings or take-offs may occur between 10:00 p.m. and 7:00 a.m. and the total number of landings and take-offs may not exceed 174 each year: 41 for the period January through March, 46 for the period April through June, 46 for the period July through September, and 41 for period October through December. "Unused" allotments may be carried over to subsequent months, as long as the total comes within the yearly limit of 174. We are asked whether these two conditions were validly imposed when the conditional use permit was issued for the heliport. We conclude that the conditions are invalid.

Public Utilities Code section 21662.4[1] provides:

_____

[1]All references hereafter to the Public Utilities Code are by section number only.

"(a)     Emergency aircraft flights for medical purposes by law enforcement, fire fighting, military, or other persons who provide emergency flights for medical purposes are exempt from local ordinances adopted by a city, county, or city and county, whether general law or chartered, that restrict flight departures and arrivals to particular hours of the day or night, that restrict the departure or arrival of aircraft based upon the aircraft's noise level, or that restrict the operation of certain types of aircraft.

"(b)     As used in this section, `emergency aircraft flights for medical purposes' are those flights in which undue delay would threaten a patient's life. `Emergency aircraft flights for medical purposes' include, but are not limited to, flights for the transportation of all of the following:

"(1)     Patients accompanied by licensed or certificated medical attendants such as paramedics, nurses, physicians, and respiratory therapists.

"(2)     Surgical transplant teams for the purpose of procuring human organs for reimplantation in recipients.

"(3)     Organ procurement agency coordinators responding to a potential donor.

"(4)     Temporarily viable human organs such as a heart, liver, lungs, kidneys, and pancreas, and human tissue, blood, or blood components.

"(5)     Human tissue and blood samples for clinical testing to determine compatibility between a donor and a recipient.

"(6)     Mechanical adjuncts or biological replacements for human organs.

"(7)     Medical equipment and supplies.

"`Emergency aircraft flights for medical purposes' do not include the transportation of medical personnel to attend seminars, conferences, or speaking appearances in which undue delay would not jeopardize any patient's medical condition.

"(c)     Written information concerning the emergency shall be submitted to the airport proprietor for all emergency aircraft flights within 72 hours prior or subsequent to the departure or arrival of the aircraft.  For all emergency aircraft flights for medical purposes, the information shall include the patient's name and address, the names of medical attendants or personnel and the discipline in which they are licensed or hold a certificate to practice, a signed statement by the attending physician specifying that a medical emergency was involved, the requesting medical facility or agency, the intended destination, the type and registration number of the aircraft, and the names of all flight crew members.

"This subdivision does not apply to emergency aircraft flights for medical purposes by law enforcement, fire fighting, or military personnel.

"(d)     Any airport that incurs additional expenses in order to accommodate the arrival or departure of emergency aircraft flights for medical purposes may

charge the patient on whose behalf the flight is made, or any organization or entity which has volunteered to reimburse the airport, for those expenses.

"(e)    For emergency aircraft flights for medical purposes, when two airports are located in the same geographical area, and one of the airports is a `closed' or restricted airport, the Legislature encourages that use of the `open' or unrestricted airport when feasible, rather than using the `closed' or restricted airport.

"(f)    When leasing aircraft for flights for emergency medical purposes, the Legislature encourages the use, when feasible, of aircraft which comply with local noise ordinances."

In interpreting the language of section 21662.4, we are guided by several well established principles of statutory construction.  "In construing a statute a court's objective is to ascertain and effectuate the underlying legislative intent." (*Moore* v. *California State Board of Accountancy* (1992) 2 Cal.4th 999, 1012.)  "In determining intent, we look first to the language of the statute, giving effect to its `plain meaning.'" (*Kimmel* v. *Goland* (1990) 51 Cal.3d 202, 208-209.)  "`To discern legislative intent, we must examine the legislative history and statutory context of the act under scrutiny.' [Citation.]" (*Long Beach Police Officers Association* v. *City of Long Beach* (1988) 46 Cal.3d 736, 743.)  "[E]ffect should be given, whenever possible, to the statute as a whole and to every word and clause thereof, leaving no part of the provision useless or deprived of meaning. [Citations.]" (*California Association of Psychology Providers* v. *Rank* (1990) 51 Cal.3d 1, 18.)  "When uncertainty arises in a question of statutory interpretation, consideration must be given to the consequences that will flow from a particular interpretation. [Citation.]  In this regard, it is presumed the Legislature intended reasonable results consistent with its expressed purpose, not absurd consequences. [Citations.]" (*Harris* v. *Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1165-1166.)

Applying these principles of construction, we observe that section 21662.4 was enacted in 1990 (Stats. 1990, ch. 270, § 1) to serve the following declared purposes:

"The Legislature finds and declares that emergency aircraft flights for medical purposes by law enforcement, fire fighting, military, and other persons who provide those flights affect the welfare of all of the citizens of the state, and that facilitating those flights is a matter of statewide concern.  It is therefore the intent of the Legislature, by that addition of Section 21662.4 to the Public Utilities Code, to preempt the ordinance of any chartered city insofar as that ordinance may restrict emergency aircraft flights for medical purposes by law enforcement, fire fighting, military, and other persons who provide those flights by restricting flight departures and arrivals to particular hours of the day or night, restricting the departure or arrival of aircraft based upon the aircraft's noise level, or restricting the operation of certain types of aircraft."  (Stats. 1990, ch. l270, § 2.)

Examining the individual terms of section 21662.4, we first note that an "aircraft" includes a helicopter (§ 21012) and an "airport" includes a heliport (§ 21013).[2]  The prohibition of section 21662.4 refers to the "ordinances" of a city or county.  Is a conditional use permit different from an ordinance for purposes of the statute?  We believe that it is not.  While the adoption of an ordinance is a legislative act and the issuance of a conditional use permit is an administrative,

_____

[2]We are informed that some emergency service helicopters are based at heliports located on the grounds of hospitals and other medical facilities.

adjudicatory act (see *United States Outdoor Advertising Co.* v. *Business, Transportation & Housing Agency* (1984) 44 Cal.3d 242, 248; *City of Santee* v. *Superior Court* (1991) 228 Cal.App.3d 713, 718), a conditional use permit may only be issued pursuant to criteria specified in an ordinance (see Gov. Code, § 65901, subd. (a); *Smith* v. *County of Los Angeles* (1989) 211 Cal.App.3d 188, 197). A conditional use permit "allows a use permitted rather than proscribed by the zoning regulations, but because of the possibility that the permitted use could be incompatible in some respects with the applicable zoning, a special permit is required. [Citation.]" (*Sports Arenas Properties, Inc.* v. *City of San Diego* (1985) 40 Cal.3d 808, 815.) We find no distinction between an ordinance's express terms and an administrative action taken pursuant to an ordinance's express terms for purposes of section 21662.4. Otherwise the apparent intent of the Legislature in enacting section 21662.4 could easily be thwarted.

A local restriction against night flying between 10:00 p.m. and 7:00 a.m. is clearly a restriction upon "flight departures and arrivals to particular hours of the day or night." (§ 21662.4, subd. (a).) The more difficult question is whether a limitation upon the number of helicopter flights allowed from a hospital heliport is prohibited under the statutory language.

We have examined the 1990 legislative history of section 21662.4's enactment in some detail. The legislation was proposed in part to answer the question of whether helicopters should be allowed to fly between hospitals and airports when the level of noise affects nearby neighbors. As stated in the Republican Analysis for the Assembly Transportation Committee dated July 6, 1990:

> "Lives can be saved by the timely delivery of critically ill patients to medical centers. Also flights to transport organs for transplant programs are very time critical. . . . [A]irport neighbors could tolerate an occasional night flight operation and a little noise to save a life, [extinguish] a bad fire, effect a law enforcement action or help our military carry out an emergency operation."

We believe that section 21662.4 must reasonably be construed as prohibiting the imposition of any local restriction upon the number of emergency flight departures or arrivals that may occur during a given year or other specified time period. The statute presupposes that such flights may need to take place at any time on any day of the year. It would be anomalous to conclude, for example, that while a city could not prohibit flights during the hours of 10:00 p.m. and 7:00 a.m., it could prohibit flights on Sunday or on every day of the week except Wednesday or during every month except April. It cannot be seriously argued that a city could prohibit all but one flight each year from a hospital heliport. In effect, the city's restriction would be an attempt to "restrict flight departures and arrivals to particular hours" (§ 2166.2, subd. (a)), i.e., *zero* hours after the flight limit number has been met.

Here, we interpret section 21662.4 in light of its legislative purpose to protect "the welfare of all of the citizens of the state." (Stats. 1990, ch. 270, § 1.) Local restrictions upon emergency flights are not to be tolerated. A prohibition against all emergency flights after a given number have been made would constitute such a restriction.

In answer to the question presented, therefore, we conclude that a city may not restrict the number and hours of emergency medical landings and take-offs at a hospital heliport when issuing a conditional use permit for operation of the heliport.

* * * * *

4. 94-305